**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 27, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

DEVONTE JEMELL STARKS,

      Defendant - Appellant.

No. 19-3256

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 5:18-CR-40105-JTM)**

---

Paige A. Nichols, Assistant Federal Public Defender (Melody Brannon, Federal Public Defender, with her on the briefs), Office of the Kansas Federal Public Defender, Topeka, Kansas, for Defendant-Appellant.

James A. Brown, Assistant United States Attorney (Duston J. Slinkard, Acting United States Attorney, with him on the brief), Office of the United States Attorney, District of Kansas, Topeka, Kansas, for Plaintiff-Appellee.

---

Before **HOLMES**, Circuit Judge, **LUCERO**, Senior Circuit Judge, and **PHILLIPS**, Circuit Judge.

---

**HOLMES**, Circuit Judge.

---

Devonte Starks appeals from his convictions for possession with intent to distribute fentanyl and possession with intent to distribute heroin. The central question that we must address is whether Mr. Starks's conviction can be upheld after the government advised the jury in its closing argument that Mr. Starks's right to be presumed innocent no longer existed after the presentation of the trial evidence (i.e., the "presumption-of-innocence advisement"). Mr. Starks did not object to this presumption-of-innocence advisement. Accordingly, we review his appellate challenge under the rigorous plain-error rubric. Under that rubric, we conclude—as the government concedes—that the district court committed clear or obvious error in allowing this advisement to stand uncorrected before the jury. We further believe that this error had some prejudicial effects. Irrespective of whether those effects, standing alone, were sufficient to affect Mr. Starks's substantial rights and warrant reversal, we conclude that, when those effects are cumulated with the prejudicial effects stemming from two other errors—which the government also concedes—Mr. Starks's convictions cannot stand. Accordingly, exercising jurisdiction under 28 U.S.C. § 1291, we **reverse** Mr. Starks's convictions and **remand** the case to the district court with instructions to **vacate** its judgment and to conduct further proceedings consistent with this opinion.

2

**I**

**A**

On September 17, 2018, Kansas Highway Patrol Troopers Goheen and Birney stopped a Toyota Camry ("Toyota") and a Chevrolet Impala ("Chevy") that were driving single file across Interstate 70 ("I-70") in Kansas. The Chevy was occupied by two men—Mr. Starks and Kevin Scott—and contained drug paraphernalia, but no drugs. The Toyota was occupied by two women—Toya Avery and Lamika Watt—and contained two drug-laden suitcases holding two kilograms of fentanyl and four kilograms of heroin.

More specifically, Trooper Goheen initially focused on the cars because the Toyota was following the Chevy too closely on the highway. By the time the troopers caught up to the vehicles, they had switched positions and the Chevy (occupied by Mr. Starks and Mr. Scott) was following the Toyota too closely. Trooper Goheen checked the Kansas Turnpike's computer system—which stores photographs that cameras on the turnpike take of vehicular traffic on I-70—and noted that, on September 13, 2018 (i.e., four days prior), the same two vehicles had passed the Bonner Springs turnpike station, traveling in the same lane, six seconds apart. Based on that information, Trooper Goheen inferred that the vehicles had been intentionally traveling together.

Trooper Goheen pulled up next to the Toyota—occupied by Ms. Avery and Ms. Watt. And, when he did so, the Chevy pulled in behind his vehicle and began

3

following it too closely.  Trooper Goheen radioed Trooper Birney to stop the Chevy for a following-too-closely violation, and he did so.  Around the same time, Trooper Goheen observed that the license-plate bracket of the Toyota obscured the state of registration (i.e., Ohio), which is a traffic offense, and he accordingly stopped the Toyota.

Trooper Goheen approached the Toyota on the driver's side.  When Ms. Avery, who was driving the Toyota, rolled down her window, Trooper Goheen smelled burnt marijuana.  He also observed that Ms. Avery's hands were shaking when she produced her license.  Both Ms. Avery and Ms. Watt denied traveling with the occupants of the Chevy.  They stated that they were coming from Utah and Colorado and were headed to Kansas City.  Ms. Watt said that she was on a business trip that involved recruiting people.  They provided Trooper Goheen with a rental agreement for the Toyota; according to the rental agreement, Ms. Watt had rented the vehicle in Ohio five days prior, on the morning of September 12, 2018.

Because of (among other things) the smell of marijuana, Trooper Goheen suspected Ms. Avery and Ms. Watt of committing a criminal offense and instructed them to get out of the Toyota, so he could search it.  During the search, Trooper Goheen found fentanyl and heroin in two suitcases in the trunk.  Trooper Goheen arrested Ms. Avery and Ms. Watt, both of whom denied knowledge of the drugs.  The packages were not tested for fingerprints or DNA.

Meanwhile, Trooper Birney had pulled over the Chevy; Mr. Starks was driving and Mr. Scott was the passenger. As with the Toyota, Trooper Birney smelled burnt marijuana inside this vehicle. Mr. Starks and Mr. Scott told Trooper Birney that they were not traveling with the Toyota and did not know its occupants. Mr. Starks explained that he was following the Toyota too closely because he had his cruise control set and the Toyota slowed down. The Chevy also was a rental vehicle. Trooper Birney obtained the rental agreement; it showed that Mr. Scott had rented the vehicle. When Trooper Birney questioned the two men about their travel plans, they said that Mr. Scott had picked up Mr. Starks in Arizona and they had spent some time in Las Vegas. And, now, they were heading to Topeka, Kansas, to see Mr. Starks's son.

When Trooper Birney returned to his vehicle to perform a records check of Mr. Starks's license, he learned on the radio from Trooper Goheen that, four days prior, the same two vehicles had passed the Bonner Springs turnpike station, traveling in the same lane, six seconds apart, and that Trooper Goheen had found drugs in the Toyota. Trooper Birney then returned to the Chevy and questioned Mr. Starks and Mr. Scott about the marijuana smell; both men denied having or smoking marijuana. Under questioning from Trooper Birney, both men also denied again knowing the occupants of the Toyota. Trooper Birney searched the Chevy but found no controlled substances. He did discover, however, items associated with illegal drugs in the Chevy's trunk—specifically, syringes, a

5

"vacuum sealer or a food saver," and plastic bags to package items with the sealer.  R., Vol. III, at 355 (Trial Tr., dated Apr. 2, 2019).

Ultimately, law enforcement learned that the syringes found in the Chevy belonged to Ms. Avery and the sealer and plastic bags belonged to Mr. Scott. Furthermore, law enforcement recovered a total of four cell phones from the two vehicles—two from the Chevy and two from the Toyota.  During the subsequent investigation, law enforcement determined that three of the four phones had been in contact with each other, and one of the phones had a number that was attributable to Mr. Starks.

**B**

Mr. Starks, Mr. Scott, Ms. Avery, and Ms. Watt were all subsequently charged in a three-count indictment with conspiring to possess with the intent to distribute approximately two kilograms of a mixture or substance containing a detectable amount of fentanyl and approximately four kilograms of a mixture or substance containing a detectable amount of heroin in violation of 21 U.S.C. § 846 (Count 1); possessing with the intent to distribute approximately two kilograms of a mixture or substance containing a detectable amount of fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), as well as 18 U.S.C. § 2 (Count 2); and possessing with the intent to distribute approximately four kilograms of a mixture or substance containing a detectable amount of heroin in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), as well as 18 U.S.C. § 2

6

(Count 3).  Mr. Scott and Ms. Watt are currently fugitives and were not tried on the indictment.[1]  Ms. Avery pleaded guilty to the conspiracy offense and testified at Mr. Starks's trial as a government witness.

## 1

Mr. Starks's trial commenced—as the district court acknowledged—in an unconventional manner.  As particularly relevant here, apparently without consulting counsel, the court adopted what it acknowledged was an unique approach in instructing the jury.  Rather than comprehensively instructing the jury concerning the governing law after the close of the evidence, the court elected to give the jury—with only a couple of exceptions that it deemed "better left to the end of the case"[2]—the full set of instructions regarding the governing law immediately *before* the presentation of the evidence.  R., Vol. III, at 272 (Trial Tr., dated Apr. 1, 2019).  Addressing the jury, the court said:

> Well, folks, usually the instructions are given at the end of the
> case, right before closing arguments.  It has always seemed to me

---

[1]     Mr. Scott was released after he told law enforcement that he would become a confidential informant.  He never contacted the government after his release, and the government has not been able to locate him.  Ms. Watt also fled after she was released from a detention facility in Russell County, Kansas.

[2]     The two exceptions—that is, the instructions the court did not give at that time—related, generally, to the jurors' responsibility to arrive at a "unanimous" verdict, if they could "do so without violating [their] individual judgment and [their individual] conscience" and, further, the mechanics of the deliberation process, including the "first" requirement to "select a presiding juror."  R., Vol. I, at 169–72 (Instrs. 33 and 34).

that that got things backwards. It's like waiting until the end and saying, ["]Oh, by the way, these are the things that you should have been listening for throughout the trial.["]

*Id.* at 244. The court allowed each juror to have a written set of the instructions, which permitted the jurors (if they wished) to "read along" while the court orally gave them the instructions, and to "take notes" on, and "refer" to, their copies of the written instructions during the course of the trial. *Id.* And the court also informed the jury that the "original copy of the instructions" would "go back to the jury room with [them] at the end," along with "the verdict form." *Id.* at 272.

Notably, among the instructions that the court gave at this early stage were the instructions directly bearing on the government's obligation to establish Mr. Starks's guilt "beyond a reasonable doubt" (i.e., Instrs. 5 and 7) and concerning the "presumption of innocence" that is constitutionally afforded to Mr. Starks (i.e., Instr. 6). *Id.* at 248–50. In particular, in orally presenting Instruction No. 6—regarding the presumption of innocence—the court informed the jury that the presumption of innocence "remains with [Mr. Starks] throughout the trial." *Id.* at 249.

After the court finished instructing the jury, the parties presented their evidence and closing arguments over the course of approximately two days. We turn now to consider the evidence and arguments that the jury heard, insofar as they bear on Mr. Starks's contentions of error.

**2**

During its case in chief, the government called Troopers Goheen and Birney to testify. The troopers communicated to the jury their factual observations concerning the traffic stop of Mr. Starks. But Mr. Starks's counsel objected to five of the troopers' statements that he believed constituted improper expert testimony regarding the purported patterns and practices of drug traffickers. In particular, Mr. Starks objected that the government had provided "no notice of expert testimony," and that the testimony was subject to "a *Daubert* analysis[3] or [Federal Rule of Evidence] 702 analysis." R., Vol. III, at 297–98. Specifically, Mr. Starks objected to the following five statements:

> 1.    Trooper Goheen's statement that "from our training and experience and what we're seeing out on the road, [I-70 and I-35] are . . . the main highways of the United States that these drugs are being trafficked . . . on because [they are the] most direct route[s]." *Id.* at 277.
>
> 2.    Trooper Goheen's statement that, based on his training and experience, "the guy hauling a hundred pounds of marijuana in his trunk is probably not going to come by you at 95 miles an hour so, you know, . . . [the] violations that I'm seeing are minor . . . . For instance, no turn signals; following too close[ly]; fail[ing] to maintain a single lane of traffic, those are the types of violations that I'm out looking for because . . . the people transporting illegal contraband . . . are going to be making the minor mistakes." *Id.* at 281.
>
> 3.    Trooper Goheen's statement that, based on his training and experience, drugs are trafficked across the Mexican border,

---

[3]    *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

parceled out in California, and shipped across I-70 in "suicide loads" by rental car. *Id.* at 322–26.

4.      Trooper Goheen's statement that based on his training and experience drug traffickers use "escort vehicles or decoys" to divert law enforcement from load vehicles. *Id.* at 357–58.

5.      Trooper Birney's statement that, based on his training and experience, "just everything [was] adding up" that the two vehicles in this case and their occupants were operating together. *Id.* at 411.

The court overruled Mr. Starks's objections. As to Trooper Goheen, for example, the court stated that it did "not consider what he has talked about in terms of his knowledge and experience and conclusions he was drawing as expert testimony but just the things that support his reasons for doing the things that he did out there." *Id.* at 299.

During its closing argument, the government highlighted this testimony, saying:

> Remember the testimony of Trooper Goheen. Trooper Goheen told you that based on his training and experience, what you see in interdiction is a load car and then an escort car. In this case, who's driving that escort car? The defendant [i.e., Mr. Starks].
>
> What does the defendant do? The defendant, when he sees the trooper pulling up along side, about to pull over the dope car, he whips over and tailgates a trooper.
>
> I challenge any of you to pull over and tailgate a trooper like that without knowing exactly what's going to happen.

*Id.* at 630 (Trial Tr., dated Apr. 3, 2019).

**3**

After Troopers Goheen and Birney testified, the government called Special Agent Heizer from the Department of Homeland Security. Agent Heizer testified to the authenticity of a government record, Exhibit 11. Exhibit 11 showed that two men, possessing names and birthdays identical to those of Mr. Scott and Mr. Starks, crossed the U.S.-Mexico border on foot at 9:00 p.m. EST on September 7, 2018—which was five days before Mr. Scott and Ms. Watt rented the cars that Troopers Goheen and Birney later stopped on September 17. Eighteen minutes later, they returned to the United States on foot via that same entry-exit point, within one minute of each other.

Mr. Starks's counsel objected to the introduction of Exhibit 11 on hearsay grounds. Specifically, Mr. Starks's counsel maintained that Agent Heizer had no personal knowledge concerning the creation of Exhibit 11 nor regarding the section of the border where that record was generated. His objection was overruled without comment.

**4**

Following Agent Heizer's testimony, the government called Drug Enforcement Administration ("DEA") Task Force Officer Proffitt ("TFO Proffitt") to testify concerning the post-arrest search of the phones found in the Chevy and Toyota, as well as Mr. Starks's prior criminal history. In addition to testifying that three of the four phones had been in contact with each other, and

that one of the phones had a number that was attributable to Mr. Starks,[4] TFO

Proffitt noted that all of the phones had been activated on September 11,

2018—six days before the traffic stop. Through TFO Proffitt, the government

also presented evidence that in 2015 Mr. Starks was convicted in state court for

attempted possession of heroin for sale, for which he served prison time.

Notably, during his cross-examination of TFO Proffitt, Mr. Starks's counsel

asked TFO Proffitt about a search warrant he had obtained for Mr. Starks's

residence *after* Mr. Starks's arrest on September 17, 2018, and prior to trial.

Specifically, Mr. Starks's counsel asked TFO Proffitt what he found as a result of

that warrant, and if he had hoped to use that warrant to find additional evidence

of drug trafficking. TFO Proffitt stated that he obtained and executed the warrant

hoping to find additional drug-trafficking evidence, but his search of Mr. Starks's

residence yielded no such evidence.

On redirect, the government asked TFO Proffitt how he obtained probable

cause for the warrant. TFO Proffitt stated that two non-testifying, local police

officers who had responded to a domestic-dispute call at Mr. Starks's residence

had informed him that they observed a gallon-sized Ziploc bag of cash at the

---

[4]    Tracking in part the testimony of Ms. Avery, discussed *infra*, TFO Proffitt testified that contact information had been saved on the four phones under various names: "three had a [contact saved as], T-A, and the fourth had other versions, it had a Vonte, a Vonte KC, and . . . a Bro Tae," and the stored data from the phones also referenced "Bro Tay" and "Ta." R., Vol. III, at 440–41.

home and smelled marijuana coming from Mr. Starks's person, the residence, and a car on the property.

**5**

The government concluded its presentation of evidence with testimony from Ms. Avery. Following her arrest, as previously noted, Ms. Avery pleaded guilty to the conspiracy charge, and she agreed to testify as a government witness under a plea agreement—with the acknowledged hope of receiving a more lenient sentence. During her testimony, Ms. Avery stated that Mr. Scott regularly sold heroin and fentanyl and used her as a drug tester. In that regard, Ms. Avery testified that she was "addicted to heroin and fentanyl" and had "a very, very high tolerance" for the drugs; thus, she was "beneficial to someone who sells drugs on [a] large scale," like Mr. Scott, as a tester of the quality of the drugs. R., Vol. III, at 519–20. They both worked the narcotics trade in Akron, Ohio.

Ms. Avery stated that she first met Mr. Starks in Arizona after Mr. Scott asked her to accompany him to meet a new potential supplier of heroin. In Arizona, Mr. Starks, Ms. Avery, and Mr. Scott went to a house in a gated community, where Ms. Avery tested tar heroin in the presence of Mr. Scott and Mr. Starks. When Ms. Avery proclaimed that the heroin was "junk," Mr. Starks reportedly indicated that he would "talk to [his sources] and figure out what can be done about this." *Id.* at 526–27. Mr. Scott and Ms. Avery then transported some heroin back to Ohio. The two typically traveled in rental cars that Mr. Scott

would rent and pay for. Ms. Avery testified that it was her understanding that Mr. Starks "was going to get paid every time" they did a drug deal with his suppliers. *Id.* at 540.

Ms. Avery testified that she met Mr. Starks at the same house in Arizona on two subsequent trips with Mr. Scott. According to Ms. Avery, on the first of these trips—which occurred around two months after the initial one—their group was joined by "two Mexicans" who were narcotics suppliers of Mr. Starks. *Id.* at 533. The Mexican suppliers had brought with them "a kilo of heroin," Ms. Avery testified, but this was not satisfactory to her and Mr. Scott because Ms. Avery said that she and Mr. Scott also wanted fentanyl; they "needed both" heroin and fentanyl. *Id.* at 534. Mr. Scott expressed this need for both drugs to Mr. Starks and his "Mexican" suppliers, but he purchased the heroin. *Id.* Mr. Scott and Ms. Avery "broke it down, repackaged it and taped it to [her] body," and then transported the heroin back to Ohio. *Id.* at 535. On the final Arizona trip, Ms. Avery testified that one of Mr. Starks's suppliers did bring both—more than a kilo of heroin and fentanyl. Mr. Scott purchased the narcotics, and, as before, he and Ms. Avery repackaged the drugs and traveled back to Ohio.

Notably, Ms. Avery further testified that on September 12, 2018, she met Mr. Scott, Ms. Watt, and Mr. Starks in Akron, where there were two rental vehicles present—a Toyota and a Chevy. Mr. Scott gave everyone a phone with pre-programmed contact information under different names: Mr. Scott's name was

14

"Bro," Ms. Avery's name was "Sis," and Mr. Starks's name was "Ta." *Id.* at 558. The four traveled to Anaheim, California. On the way there, before entering California, Ms. Avery stated that Mr. Starks spoke with someone on a speaker-phone about getting drugs out of California, but the person advised that there was no safe way to do so. Once they arrived in California, they stayed for a few days; Ms. Avery was not sure why and did not ask. On the group's return, Ms. Avery started off riding in the car with Mr. Starks and Mr. Scott, but later joined Ms. Watt in her vehicle. Ms. Avery did a small portion of the driving and had "been driving about five or ten minutes" when the Kansas trooper (i.e., Trooper Goheen) pulled her over. *Id.* at 563.

Ms. Avery stated that, even though Mr. Scott had recruited her for the Anaheim trip and she believed that she would be testing drugs, she had not heard about any drug transaction or tested any drugs during the trip. Significantly, Ms. Avery testified that she did not know that drugs were in her vehicle on September 17, 2018—the day she was pulled over and arrested. She further testified that she did not talk directly to Mr. Starks about drug transactions. Ms. Avery said she and Mr. Starks did not "have an understanding about drugs. He's not paying for them and I'm not, either, so we don't need to be talking about how much of anything is going to be, you know, bought because we're not buying it." *Id.* at 561.

**6**

Significantly, at the conclusion of the evidence—two days after the trial began—the district court elected not to comprehensively instruct the jury again. Specifically, in response to the government's inquiry as to whether it would do so, the court responded that it was "not going to go through the instructions again," but it would "read those final two instructions" that it initially had reserved for the end of the evidence, and then counsel could present their closing arguments. *Id.* at 485. Those two instructions concerned, generally, the jurors' responsibility to arrive at a "unanimous" verdict, if they could "do so without violating [their] individual judgment and [their individual] conscience," and, further, the mechanics of the deliberation process. R., Vol. I, at 169–72 (Instrs. 33 and 34); *accord id.*, Vol. III, at 620–22. As the court described them, those mechanics included the "first" requirement of the jury to "select a presiding juror" and "[t]he second thing [the jury] should do," that is, "review the instructions." *Id.*, Vol. I, at 171 (Instr. 34); *accord id.*, Vol. III, at 621. As to the "second thing," the court advised the jury that their work as jurors would be "more productive" if they were familiar with "the legal principles upon which [their] verdict must be based." *Id.*, Vol. I, at 171 (Instr. 34); *accord id.*, Vol. III, at 621.

Notably, however, as a consequence of the court's unconventional approach regarding the timing of the delivery of its oral instructions, the jury heard the

court's oral instructions concerning most of the governing law only once, and approximately two days before they began deliberations. In particular, the jury did not hear again—at the close of the evidence—the court's oral instructions regarding the government's beyond-a-reasonable-doubt burden of proof (i.e., Instrs. 5 and 7) nor the court's instruction concerning the presumption of innocence that the Constitution afforded Mr. Starks (i.e., Instr. 6).

**7**

After the jury heard the court's two remaining instructions, the parties' counsel gave their closing arguments. Importantly, in its closing, the government told the jury:

> Now, on Monday, if you'll recall, you were instructed that this defendant was presumed innocent. That he was clothed in the presumption of innocence. And *that was absolutely true Monday*. But here we are[, on] Wednesday. Ladies and gentlemen, I submit to you that based upon the evidence and based upon your common sense, that *that is no longer true*. That as the defendant sits before you today, that that presumption *has been changed* based upon [the] substantial weight of credible evidence. And as you see him, the naked truth about him, this man, based on this evidence, is a drug dealer.

*Id.*, Vol. III, at 627 (emphases added). Mr. Starks's counsel did not contemporaneously object, and the court did not admonish the government or otherwise comment on the propriety of its argument.

The government then proceeded to make statements regarding its witnesses' truthfulness. Specifically, the government stated that Ms. Avery was bound to a

17

plea agreement requiring her "only to do one thing: [t]ell the truth." *Id.* at 631. The government added, "[n]obody has ever told her to do anything other than tell the truth. And she sat there and she told you the absolute truth . . . ." *Id.* Mr. Starks's counsel objected to this statement as improper vouching. The district court sustained the objection, and it also instructed the jury to disregard the statement: i.e., "Jury will ignore what the prosecutor says in terms of truthfulness. That's your determination to make, not counsel's." *Id.*

**8**

During his subsequent closing argument, Mr. Starks's counsel did express his disagreement with the prosecutor's presumption-of-innocence advisement: "[The] Prosecutor said when he stood up that . . . [Mr.] Starks had the presumption of innocence but he doesn't now. I would disagree with that as a point of law. Until you decide otherwise, you, the jury, . . . Mr. Starks is presumed innocent. And he is innocent." *Id.* at 657. But the court itself did not instruct the jury regarding this matter or otherwise take remedial action.

When Mr. Starks's counsel concluded, the government began its rebuttal closing argument with forceful statements that appeared to be aimed at bolstering the credibility of Ms. Avery, the only government witness who testified about the alleged narcotics conspiracy and Mr. Starks's supposed involvement in it. Specifically, the government's counsel said:

> Ladies and gentlemen, from the defendant's [i.e., Mr. Starks's]

18

point of view, as you just heard, you should believe everything about everyone else in this conspiracy except the defendant. That's not the law. It would defy human nature and common sense.

They attack Ms. Avery. Well, conspiracies are characterized by their secrecy and their criminal nature and people involved. Hatching plots in hell doesn't involve angels.

*Id.* at 658. Further, the government sought to lend additional credibility to the predicate for Agent Proffitt's search of Mr. Starks's residence. In particular, the government stated "based upon the observations of the officers[,] . . . a search warrant was acquired. [A j]udge look[ed] at the evidence and [concluded there was] probable cause to search . . . ." *Id.* at 660. Mr. Starks's counsel objected to this as improper vouching. The court sustained the objection, but did not provide a curative instruction.

The government also made statements commenting on Trooper Birney's and Trooper Goheen's testimony. Specifically, the government stated to the jury: "You saw Trooper Birney. You saw Trooper Goheen. You know their demeanor. You know how they do their jobs and how they've done it for years. They have no axe to grind and no reason to make things up and they don't take shortcuts." *Id.* at 661. Mr. Starks's attorney did not object to this statement.

**9**

After hearing closing arguments, a little after 12:00 pm—approximately two days after orally receiving most of their instructions from the court—the jury

19

retired to deliberate, with a written set of the "original" instructions and the verdict form. *Id.* at 664. After being dismissed at the end of the business day, it returned to court the next day and reached a verdict in the early afternoon. The jury convicted Mr. Starks of the two counts charging him with possessing with the intent to distribute narcotics—specifically, fentanyl (Count 2) and heroin (Count 3). However, the jury could not reach a verdict regarding the conspiracy charge (Count 1), and the court subsequently dismissed that charge on the government's motion. The district court sentenced Mr. Starks to a total term of 180 months' imprisonment followed by 5 years' supervised release. Mr. Starks timely appealed.

## II

Mr. Starks presents five arguments that he believes warrant reversal:

> (1)    the district court abused its discretion when it admitted expert testimony by Troopers Goheen and Birney regarding typical patterns and practices of drug traffickers, where the government failed to provide the requisite disclosures under Federal Rule of Criminal Procedure 16 and the court failed to make the necessary expert witness determinations under Federal Rule of Evidence 702;

> (2)    the district court abused its discretion by admitting hearsay evidence that Mr. Starks and Mr. Scott crossed the U.S.-Mexico border together;

> (3)    the district court plainly erred, in violation of Mr. Starks's Sixth Amendment rights, by allowing the jury to hear the out-of-court statements of non-testifying local law enforcement officers through the testimony of Agent Proffitt;

20

(4)    the district court plainly erred in allowing the government to engage in prosecutorial misconduct in closing argument, which deprived Mr. Starks of a fair trial, by (a) telling the jury that Mr. Starks's presumption of innocence had been abrogated before jury deliberations, (b) improperly vouching for Ms. Avery, Troopers Goheen and Birney, and the non-testifying local officers regarding whom Agent Proffitt testified, and (c) in its rebuttal argument, telling "jurors that the law prohibited them from concluding that [Ms.] Avery was telling the truth about her own and Mr. Scott's drug dealing, but lying about Mr. Starks"; and

(5)    the cumulative effect of two or more of the foregoing errors deprived Mr. Starks of a fair trial.

*See* Aplt.'s Opening Br. at i–ii, 2.

However, in order to conclude that Mr. Starks's convictions cannot stand, we need not—and therefore do not—reach most of these arguments. *See, e.g.*, *United States v. Chavez*, 976 F.3d 1178, 1213 n.20 (10th Cir. 2020). That is because we determine that the cumulative effects of three errors that Mr. Starks alleges are enough to warrant reversal of his convictions: specifically, (1) the unpreserved error arising from the government's presumption-of-innocence advisement, (2) the preserved error concerning the court's admission of the expert testimony of Troopers Goheen and Birney regarding typical patterns and practices of drug traffickers, and (3) the unpreserved error relating to the prosecution's vouching for Ms. Avery's credibility.

More specifically, we begin our analysis with arguably the most problematic of the errors: that is, the one pertaining to the government's

21

presumption-of-innocence advisement.  As noted, Mr. Starks did not preserve his challenge to this error in the district court (i.e., he failed to object to it).  Thus, our review is only for plain error.  *See, e.g.*, *United States v. Anaya*, 727 F.3d 1043, 1053 (10th Cir. 2013).  The government does not dispute that, under the second prong of the plain-error test, this error was clear or obvious.  Moreover, in our view, this error had some prejudicial effects.  Regardless of whether those effects, standing alone, were sufficient to affect Mr. Starks's substantial rights and warrant reversal, we conclude that, when those effects are cumulated with the prejudicial effects of the errors relating to the court's admission of the expert testimony of Troopers Goheen and Birney and the prosecution's vouching for Ms. Avery's credibility, we cannot uphold Mr. Starks's convictions.

**A**

**1**

Under the plain-error rubric, reversal is only warranted where there is "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *United States v. Portillo-Vega*, 478 F.3d 1194, 1202 (10th Cir. 2007) (quoting *United States v. Gonzalez-Huerta*, 403 F.3d 727, 732 (10th Cir. 2005) (en banc)).  "We 'apply the plain error rule less rigidly when reviewing a potential constitutional error.'"  *United States v. Dalton*, 918 F.3d 1117, 1130 (10th Cir. 2019) (quoting *United States v. Weeks*, 653 F.3d 1188, 1198 (10th Cir.

2011)).

An error is "plain" if it is "so clear or obvious that it could not be subject to any reasonable dispute." *United States v. Courtney*, 816 F.3d 681, 684 (10th Cir. 2016). "In turn, to be clear or obvious, the error must be contrary to well-settled law." *United States v. Taylor*, 514 F.3d 1092, 1100 (10th Cir. 2008). "In general, for an error to be contrary to well-settled law, either the Supreme Court or this court must have addressed the issue." *United States v. Ruiz-Gea*, 340 F.3d 1181, 1187 (10th Cir. 2003). To demonstrate under the third prong of the plain-error test that an error affected a defendant's substantial rights, "a defendant generally must demonstrate that an error was 'prejudicial, meaning that there is a reasonable probability that, but for the error claimed, the result of the proceeding would have been different.'" *United States v. Bustamante-Conchas*, 850 F.3d 1130, 1138 (10th Cir. 2017) (en banc) (quoting *United States v. Algarate-Valencia*, 550 F.3d 1238, 1242 (10th Cir. 2008)).

"The reasonable-probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different." *Id.* (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004)). Instead, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Hasan*, 526 F.3d 653, 665 (10th Cir. 2008) (quoting *Sallahdin v. Gibson*, 275 F.3d 1211, 1235 (10th Cir. 2002)). It is the defendant's

23

burden to make this showing, even in a case of alleged constitutional error. *Gonzalez-Huerta*, 403 F.3d at 733.

As to plain error's fourth requirement, a party that fails to raise an argument in the district court must show that allowing a non-constitutional error to stand would be "particularly egregious" and would constitute a "miscarriage of justice." *United States v. Gilkey*, 118 F.3d 702, 704 (10th Cir. 1997) (quoting *United States v. Ivy*, 83 F.3d 1266, 1295 (10th Cir. 1996)). However, "[i]n the context of an alleged constitutional error, the relaxed standard means we do not require the exceptional showing required to remand a case of non-constitutional error." *United States v. Dazey*, 403 F.3d 1147, 1178 (10th Cir. 2005). Nevertheless, the burden remains with the defendant to show "that an exercise of our discretion is appropriate." *Id.* The test is applied on "a case-specific and fact-intensive basis." *Bustamante-Conchas*, 850 F.3d at 1141 (quoting *Puckett v. United States*, 556 U.S. 129, 142 (2009)).

**2**

Prosecutorial misconduct can cause constitutional error in two ways: first, it can prejudice a specific constitutional right amounting to a denial of the right; and second, "absent infringement of a specific constitutional right, a prosecutor's misconduct may in some instances render a . . . trial 'so fundamentally unfair as to deny [a defendant] due process.'" *Underwood v. Royal*, 894 F.3d 1154, 1167 (10th Cir. 2018) (quoting *Littlejohn v. Trammell*, 704 F.3d 817, 837 (10th Cir.

24

2013)), *cert. denied, Underwood v. Carpenter*, --- U.S. ----, 139 S. Ct. 1342 (2019).

"When evaluating allegedly inappropriate remarks of counsel for plain error, we must view the remarks in the context of the entire trial." *United States v. Vann*, 776 F.3d 746, 760 (10th Cir. 2015) (quoting *United States v. Lopez-Medina*, 596 F.3d 716, 738 (10th Cir. 2010)).  The relevant context includes "the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case." *United States v. Christy*, 916 F.3d 814, 826 (10th Cir. 2019) (quoting *United States v. Gabaldon*, 91 F.3d 91, 94 (10th Cir. 1996)). The Supreme Court in *United States v. Young* observed that "[t]he line separating acceptable from improper advocacy is not easily drawn."  470 U.S. 1, 7 (1985). In *Christy*, we noted that one type of argument that clearly crosses the line into improper advocacy involves "misstating the law."  916 F.3d at 825 (citing *United States v. Currie*, 911 F.3d 1047, 1057 (10th Cir. 2018)).

**B**

Arguably, Mr. Starks's most compelling claim of error arises from the government's erroneous presumption-of-innocence advisement during its closing argument:

> Now, on Monday, if you'll recall, you were instructed that this defendant was presumed innocent.  That he was clothed in the presumption of innocence.  And *that was absolutely true Monday*.  But here we are[, on] Wednesday.  Ladies and gentlemen, I submit to you that based upon the evidence and

25

based upon your common sense, that *that is no longer true*. That as the defendant sits before you today, that that presumption *has been changed* based upon [the] substantial weight of credible evidence. And as you see him, the naked truth about him, this man, based on this evidence, is a drug dealer.

R., Vol. III, at 627 (emphases added).

We have held that the "'constitutionally rooted presumption of innocence' [is] one of those basic rights whose violation may provide a ground for vacation of a state conviction independent of the more general due process concerns underlying fundamental fairness analysis." *Mahorney v. Wallman*, 917 F.2d 469, 472 (10th Cir. 1990) (per curiam) (quoting *Brinlee v. Crisp*, 608 F.2d 839, 854 (10th Cir. 1979)). Specifically, "[t]he presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Estelle v. Williams*, 425 U.S. 501, 503 (1976); *see Cool v. United States*, 409 U.S. 100, 104 (1972) (per curiam) (discussing the "constitutionally rooted presumption of innocence"). The presumption serves as a reminder to the jury that the prosecution has the burden of proving every element of the offense beyond a reasonable doubt, and is thus a bedrock of our criminal justice system. *See Delo v. Lashley*, 507 U.S. 272, 278 (1993) (per curiam). Yet the government here advised the jury in its closing argument that, after the presentation of the evidence, Mr. Starks was "no longer" "clothed in the presumption of innocence." R., Vol. III, at 627.

On appeal, the government wisely concedes that the district court clearly or

26

obviously erred in letting this presumption-of-innocence advisement stand uncorrected before the jury. *See* Aplee.'s Resp. Br. at 44. However, the government contends that this error did not affect Mr. Starks's substantial rights and, thus, he cannot demonstrate that the third prong of the plain-error test is satisfied. Yet, in our view—irrespective of whether this is true—it is not determinative here. We conclude that, under the circumstances of this case, this clear or obvious error had some prejudicial effects. And, as noted, Mr. Starks's convictions cannot stand when these prejudicial effects are combined with the prejudicial effects of two other errors. We discuss the case-specific circumstances upon which we base this reasoning below. We begin, however, with an overview of our on-point decision in *Mahorney*—a decision that informs our subsequent analysis.

**1**

In *Mahorney*, we granted habeas relief on the ground that the prosecution's statements in closing argument impermissibly undermined the petitioner's presumption of innocence. *See* 917 F.2d at 474. Those statements are remarkably similar to those at issue here. Specifically, the prosecution said:

> I submit to you, under the law and the evidence, that we are in a little different position today than we were in when we first started this trial and it was your duty at that time, under the law of this land, as you were being selected as jurors, to actively in your minds presume that man over there not to be guilty of the offense of rape in the first degree, but, you know, *things have changed since that time*. I submit to you at this time, under the

27

law and under the evidence, that that presumption *has been removed*, that that presumption *no longer exists*, that that presumption has been removed by evidence and he is standing before you now guilty.

*Id.* at 471 (emphases added). As in this case, the prosecution did not even attempt on appeal to defend the propriety of these statements. *See id.* Nevertheless, we specifically noted that they were "impermissible because they undermined two fundamental aspects of the presumption of innocence, namely that the presumption (1) remains with the accused throughout every stage of the trial, including, most importantly, the jury's deliberations, and (2) is extinguished only upon the *jury's* determination that guilt has been established beyond a reasonable doubt." *Id.* at 471 n.2.

In particular, we noted in *Mahorney* that "the essence of the error in the prosecution's comments here was that they conveyed to the jury the idea that the presumption had been eliminated from the case prior to deliberations." *Id.* at 473. We rejected the suggestion that a generalized fundamental fairness inquiry was the proper framework for determining whether the prosecution's comments effected a constitutional violation. *Id.* at 472–73. That framework was applicable in circumstances where the court failed "to give a specific charge on the presumption of innocence." *Id.* at 472. Such a failure "'does not in and of itself violate the Constitution' in the absence of a finding that such failure, when considered with all other circumstances, rendered the trial fundamentally unfair."

28

*Id.* at 472 (quoting *Kentucky v. Whorton*, 441 U.S. 786, 789 (1979)).  Rejecting this approach, and with the prosecution's comments in mind, we stated that "[a] misstatement of law that affirmatively negates a constitutional right or principle is often, in our view, a more serious infringement than the mere omission of a requested instruction."  *Id.* at 473.

We recognized, however, that it was not enough that the prosecution's comments violated the petitioner's constitutional rights; they had to substantially prejudice him.  And, considering "the pertinent surrounding circumstances at trial," we concluded that they did "show substantial prejudice."  *Id.*  Among the factors that the court concluded supported its prejudice determination was the fact that the court's "overall charge on the presumption of innocence and burden of proof was not sufficiently specific to preserve that presumption in light of the prosecutor's specific statement that it had been extinguished from the case."  *Id.* at 473–74.  Notably, we reached this conclusion even though "[t]he jury instructions were read to the jury [by the court] before closing arguments were made."  *Id.* at 474 n.5.

"Moreover, the trial court did not thereafter attempt to cure or minimize the problem [caused by the prosecutor's presumption-of-innocence advisement] through admonishment or special instruction of the jury."  *Id.* at 473.  Furthermore, "the character and condition of the evidence" supported our determination of substantial prejudice.  *Id.* at 474.  Specifically, the outcome of

29

the case turned on the credibility of testimonial evidence, which neither "was conclusively confirmed [n]or disproportionately discredited by extrinsic evidence." *Id.* Thus, considering the particular circumstances of the case—including this state of the evidence, "the aggravated effect of the prosecution's misconduct . . . and the fact that this misconduct went directly to a fundamental precept guiding the factfinder's evaluation of guilt or innocence"—we concluded that we could not "say that the constitutional infirmity in petitioner's criminal trial was harmless." *Id.*

**2**

Akin to *Mahorney*, we conclude that, under the particular circumstances of this case, the government's presumption-of-innocence advisement—at the very least—had some prejudicial effects on the trial, irrespective of whether those effects were sufficient to affect Mr. Starks's substantial rights, within the meaning of the plain-error test's third prong. This is so because in this case (1) the substance of the court's generalized instructions was not helpful in mitigating the strong potential for prejudice—and actual prejudicial effects—caused by the prosecution's presumption-of-innocence advisement; (2) the unconventional timing of the court's delivery of its oral instructions may have undermined the capacity of the instructions to be a positive instrument for mitigating any prejudice from the advisement; and (3) contrary to the government's contentions, its proof of Mr. Starks's guilt—being essentially

30

circumstantial and dependent on the testimony of an admitted drug addict and alleged coconspirator with a plea deal—was not "overwhelming." *Cf.* Aplee.'s Resp. Br. at 21. We address each of these factors in turn.

**a**

In *Mahorney*, we bolstered our conclusion that the prosecution's presumption-of-innocence advisement, like the one here, caused the petitioner substantial prejudice by reasoning that "the trial court's overall charge on the presumption of innocence and burden of proof was not sufficiently specific to preserve that presumption in light of the prosecutor's specific statement that it had been extinguished from the case." 917 F.2d at 473–74. This reasoning also seems cogent here, where the district court offered only generalized instructions regarding the government's proof-beyond-a-reasonable doubt burden and the defendant's presumption of innocence. *See* R., Vol. I, at 54 (Instr. 5); *id.* at 135 (Instr. 6); *id.* at 136 (Instr. 7); *see also id.*, Vol. III, at 248–50 (Instrs. 5, 6, and 7).

Moreover, as in *Mahorney*, after the prosecution made its impermissible statements concerning the presumption of innocence, "the trial court did not thereafter attempt to cure or minimize the problem through admonishment or special instruction of the jury," 917 F.2d at 473—even though, as the government here concedes, the error was clear or obvious and thus an error that the court should have addressed sua sponte. This silence in the court's instructions

31

possibly could have left the jury with the impression that the court condoned the prosecution's impermissible statements. *See Currie*, 911 F.3d at 1056 ("A court's refusal to correct a prosecutor's misstatement of law may affect the prejudicial effect of the comment."); *cf. United States v. Slatten*, 395 F. Supp. 3d 45, 103 (D.D.C. 2019) ("Because this Court quickly, forcefully, and repeatedly corrected the prosecutor's erroneous insinuation that the presumption of innocence no longer applied, [the defendant] wasn't prejudiced."); *cf. also Taylor*, 514 F.3d at 1100–01 (concluding district court's instruction immediately after improper comment cured prejudicial effect).[5]

Therefore, the substance of the district court's generalized instructions here

---

[5]     In his closing argument, defense counsel attempted to address the prosecution's erroneous presumption-of-innocence advisement. He said:

> [The] Prosecutor said when he stood up that on Monday [Mr.] Starks had the presumption of innocence but he doesn't now. I would disagree with that as a point of law. Until you decide otherwise, you, the jury, we, the people, Mr. Starks is presumed innocent. And he is innocent.

R., Vol. III, at 657. However, by its own terms, this comment of Mr. Starks's counsel expressed nothing more than a mere disagreement with the prosecution regarding the law. And the instructions made clear that the jury was obliged to look to the court for guidance regarding the governing law. *See id.* at 245 ("You must not substitute or follow your own notion or opinion as to what the law is or ought to be. It is your duty to apply the law as I explain it to you, regardless of the consequences."); *accord id.*, Vol. I, at 128. Accordingly, though well-intentioned, counsel's response to the prosecution's erroneous presumption-of-innocence advisement had little force to diminish the strong potential for prejudice—and actual prejudicial effects—stemming from the advisement and certainly could not make up for the court's failure to correct the advisement.

was unhelpful in mitigating the strong potential for prejudice—and actual prejudicial effects—caused by the prosecution's presumption-of-innocence advisement.  To be sure, the court's presumption-of-innocence instruction stated that the presumption "remains with [the defendant] *throughout the trial*."  R., Vol. III, at 249 (emphasis added); *accord id.*, Vol. I, at 135.  However, nothing in the jury instructions defined what procedural events constituted the "trial."  As a result, a reasonable juror could have erroneously concluded—in a manner consistent with the government's flawed presumption-of-innocence advisement—that the "trial" ended with the close of evidence.  *Cf. Mahorney*, 917 F.2d at 471 n.2 ("[T]he presumption of innocence . . . remains with the accused throughout every stage of the trial, including, most importantly, the jury's deliberations, and . . . is extinguished only upon the *jury's* determination that guilt has been established beyond a reasonable doubt.").

Further, the government reminds us that the court—in addition to instructing the jury regarding the government's beyond-a-reasonable-doubt burden and the presumption of innocence—also instructed the jury that "[s]tatements, arguments, and remarks of counsel are not evidence in the case," and that the jury was admonished to "consider only the evidence in the case."  R., Vol. I, at 167 (Instr. 32).  And the government points to the unremarkable proposition that "the jury is presumed to have followed" its instructions.  Aplee.'s

33

Resp. Br. at 45; *see also Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions."); *Bland v. Sirmons*, 459 F.3d 999, 1015 (10th Cir. 2006) (noting that "[t]he jury is presumed to follow its instructions, even when there has been misleading argument" (citation omitted)).

The government's line of argument is of course intended to suggest that Mr. Starks was not prejudiced by the prosecutor's impermissible presumption-of-innocence advisement because the jury—by dutifully following its instructions—would have ignored the advisement. However, the presumption that the jury follows its instructions in the face of a prosecutor's impermissible arguments is just that—a presumption.

More to the point, in the context of a prosecution argument remarkably similar to the one here, we emphasized that "[a] misstatement of *law* that affirmatively negates a constitutional right or principle" frequently results in a "serious infringement" of a defendant's constitutional rights. *Mahorney*, 917 F.2d at 473 (emphasis added). And, as Mr. Starks aptly notes, "that instruction [providing that counsel's statements or arguments are not evidence, which the government relies on here] says nothing about counsel's statements about *the law*. The prosecutor's improper statement about the presumption of innocence stood uncorrected by any instruction."[6] Aplt.'s Reply Br. at 13. Accordingly, guided in

---

[6]    It is true that the court's generalized instructions told the jury that it
(continued...)

34

substantial part by *Mahorney*'s reasoning and outcome, we are inclined to

conclude that the district court's generalized admonishments to the jury about the

non-evidentiary quality of counsel's arguments would have had little effect in

dissipating the strong potential for prejudice—and actual prejudicial

effects—stemming from the prosecution's presumption-of-innocence advisement.

In sum, the substance of the district court's generalized instructions was unhelpful

in mitigating this strong potential for prejudice and actual prejudicial effects of

this advisement.

**b**

Moreover, at least under the circumstances here, the court's unconventional

timing in orally delivering virtually all of its instructions may have significantly

undermined any capacity that the court's generalized instructions had to mitigate

---

[6](...continued)
should "apply the law as [the court] explain[ed] it to [the jury]."  R., Vol. III, at 245 ("You must not substitute or follow your own notion or opinion as to what the law is or ought to be.  It is your duty to apply the law as I explain it to you, regardless of the consequences.").  Arguably, this could have suggested to the jury that counsel's statements and arguments should not be understood as providing the law of the case.  However, even though the jury was thus informed that it should look to the court for the governing law, as we explain, the court unconventionally gave the jury this oral instruction approximately two days before it began deliberating, *see infra*, II.B.2.b—which may have significantly diminished the instruction's capacity to mitigate the potential and actual prejudicial effects of the prosecution's presumption-of-innocence advisement. And, more broadly, the substance of the court's generalized instructions was unhelpful in mitigating the strong potential for prejudice—and actual prejudicial effects—caused by this advisement.

the strong potential for "serious infringement" of Mr. Starks's constitutional rights—and also the actual prejudicial effects of the advisement. *Mahorney*, 917 F.2d at 473. The district court here acknowledged that the timing of its instructions was unconventional: with the exception of only a couple of instructions, the court elected to give the full set of instructions to the jury even before counsel started presenting evidence. *See* R., Vol. III, at 244. ("Well, folks, usually the instructions are given at the end of the case, right before closing arguments. It has always seemed to me that that got things backwards."). As the court understood, the usual practice is to give the instructions to the jury at the end of the evidence—frequently, after counsel's oral arguments. *See, e.g.*, Neil P. Cohen, *The Timing of Jury Instructions*, 67 TENN. L. REV. 681, 694 (2000) ("The usual pattern in America is that jury instructions are given after closing arguments by both sides."); 1 Kevin F. O'Malley et al., FED. JURY PRAC. & INSTR. § 7.1 (6th ed.), Westlaw (database updated Jan. 2022) ("The court's charge generally follows the jury arguments."); *id.* § 7.6 (noting that "the majority of judges deliver their instructions after final arguments"); *see also* Stephan Landsman, *The Civil Jury in America*, 62 LAW & CONTEMP. PROBS. 285, 299 (Spring 1999) ("*Once all the evidence has been presented*, it is the judge's job to inform the jury of the law to be used in deciding the case." (emphasis added)).

Significantly, the court's generalized instructions regarding the

36

government's beyond-a-reasonable-doubt burden (Instrs. 5 and 7) and the presumption of innocence constitutionally afforded to defendants (Instr. 6) were orally delivered to the jury on this unconventional schedule. And, crucially, the court did not repeat these important, bedrock instructions—or any of the others that it gave at the outset of the trial—at the close of the evidence. *See* R., Vol. III, at 485 (responding to a query from counsel regarding whether it would repeat the instructions at the close of the evidence, the court noted that it was "not going to go through the instructions again").

Therefore, as a consequence of the court's approach, the jury heard the court's oral instructions regarding most of the governing law only once and approximately two days before they began deliberations. And, in particular, the jury did not hear again—at the close of the evidence—the court's oral instructions regarding the government's burden of proof (i.e., Instrs. 5 and 7), nor the court's instruction concerning the presumption of innocence that the Constitution affords to Mr. Starks (i.e., Instr. 6).

We have never opined on the propriety of this unconventional instructional approach, and we do not need to lay down a one-size-fits-all categorical rule on the subject to resolve this case. In this regard, we recognize that the federal rules grant trial courts a certain amount of discretion regarding when they instruct the jury. *See* FED. R. CRIM. P. 30(c) ("The court may instruct the jury before or after

37

the arguments are completed, or at both times."). However, we are well aware that some courts have deemed such an unconventional approach—involving the pre-evidence oral delivery of instructions—to be problematic and even legally erroneous, where, as here, the full set of instructions is not repeated at the end of the presentation of evidence. And this is primarily because of concerns regarding the jury's capacity to remember important legal principles before they deliberate. *See, e.g.*, *State v. Woolcock*, 518 A.2d 1377, 1389 (Conn. 1986) ("While on occasion preinstructions may be necessary and trial judges should not shrink from acting, in the main we concur with Justice Fuchsberg when he said: '[T]he issue crystallization process can only achieve its potential if detailed instructions are given immediately before the jury's deliberation. Introductory remarks are no substitute.'" (alteration in original) (citation omitted) (quoting *People v. Newman*, 385 N.E.2d 598, 600 (N.Y. 1978))); *State v. Nelson*, 587 N.W.2d 439, 444 (S.D. 1998) (concluding that trial court's delivery of instructions concerning the presumption of innocence and reasonable doubt standard at the beginning of trial but not at the close of evidence violated a statutory mandate and constituted plain error, reasoning that "[p]reliminary instructions serve to inform jurors of their 'function,'" but their use "never relieves the court of its duty to comprehensively inform jurors of the law at the close of the evidence," and the idea "[t]hat jurors will remember instructions given at the beginning of a case may presume too

38

much" (quoting *State v. Eagle Star*, 558 N.W.2d 70, 74 (S.D. 1996))); *United States v. Ruppel*, 666 F.2d 261, 274 (5th Cir. 1982) (concluding that the district court erred in instructing the jury on the presumption of innocence at the beginning of the trial but failing to repeat the instructions at the close of trial eleven days later); *State v. Romanosky*, 859 P.2d 741, 742 (Ariz. 1993) (holding that the judge's failure to re-instruct the jury regarding the reasonable doubt standard at the end of the evidence was reversible error); *see also* Saul M. Kassin & Lawrence S. Wrightsman, THE AMERICAN JURY ON TRIAL: PSYCHOLOGICAL PERSPECTIVES 146 (1988) ("Preliminary instructions . . . are not a substitute for the final charge, but a supplement to it."); Cohen, *supra*, at 692 ("Of course, the early jury instructions will not replace the final instructions.").

This authority leads us, under the particular circumstances of this case, to conclude that the court's unconventional timing in delivering its oral instructions may have undermined any capacity (albeit limited) that the court's generalized instructions may have had to mitigate the strong potential for "serious infringement" of Mr. Starks's constitutional rights—and the actual prejudicial effects—caused by the prosecution's impermissible presumption-of-innocence advisement. *Mahorney*, 917 F.2d at 473; *see also* Aplt.'s Reply Br. at 12 ("The unique and early timing of the oral jury instructions in this case (before, rather than after, the presentation of evidence) meant that the district court's only oral

39

admonitions about the presumption of innocence were separated from the prosecutor's misconduct by two days.").

Indeed, if the panel in *Mahorney* discerned substantial prejudice to the petitioner from a presumption-of-innocence advisement like the one here, we are hard pressed to say that the court's unconventional timing in this case could produce a better outcome in mitigating prejudice.  In that regard, recall that in *Mahorney* the court at least offered its generalized instructions regarding the government's beyond-a-reasonable-doubt burden and the petitioner's presumption of innocence *after* the close of the evidence and "before closing arguments."  917 F.2d at 474 n.5.  But under the court's unconventional timing here, the oral instructions were only delivered to the jury once *before* the presentation of evidence and approximately two days *before* the jury retired to deliberate.

Moreover, the problematic effect of the court's unconventional timing—that is, its delivery of most of its oral instructions only once *before* the presentation of evidence—is underscored when we contrast that timing with the timing of the prosecution's delivery of its erroneous presumption-of-innocence advisement.  The prosecution offered its advisement in closing argument so that one of the last things the jury heard before retiring to deliberate was the government's uncorrected and erroneous statement that Mr. Starks no longer had a right to be presumed innocent.  One might reasonably have concerns that the

40

timing of this advisement, standing alone, could magnify its prejudicial effect.

*See, e.g.*, *United States v. Velazquez*, 1 F.4th 1132, 1140 (9th Cir. 2021)

(concluding that an error was reversible where the prosecutor's

mischaracterization of the beyond-a-reasonable-doubt standard in closing "was

among the last things the jury heard before they began deliberations, . . .

exacerbating [the court's] concerns"); *Girts v. Yanai*, 501 F.3d 743, 760 (6th Cir.

2007) (holding that an error was reversible where the prosecutor's improper

comments during closing arguments about the petitioner's silence "were some of

the last statements heard by the jury before deliberations"); *see also* Michael D.

Cicchini, *Combating Prosecutorial Misconduct in Closing Arguments*, 70 OKLA.

L. REV. 887, 891–92 (2018) ("Because jurors enter deliberations with closing

arguments . . . still ringing in their ears, those words could have more impact than

the actual evidence presented much earlier in the case.");[7] *cf. United States v. De*

---

[7]    Indeed, empirical research suggests that statements made in closing arguments—including, as here, improper comments or misstatements of law—are likely to have an outsized effect due to their temporal proximity to jury deliberations.  *See, e.g.*, Mary Nicol Bowman, *Mitigating Foul Blows*, 49 GA. L. REV. 309, 343–44 (2015) (asserting that improper prosecutorial arguments, such as improper vouching for prosecution witnesses, "might be particularly powerful during closing arguments, as empirical research supports the common wisdom among trial advocates about the persuasive power of closing arguments on jurors"; specifically, "[e]mpirical research on the 'recency effect' suggests that people tend to remember best and be influenced by the latest event in a sequence more than by earlier events"); Mary Nicol Bowman, *Confronting Racist Prosecutorial Rhetoric at Trial*, 71 CASE W. RES. L. REV. 39, 62–63 (2020) ("[The importance of] closing arguments is supported by psychological research

(continued...)

*La Luz Gallegos*, 738 F.2d 378, 383 (10th Cir. 1984) (concluding that an error

was harmless because the government's improper comments on the defendant's

silence in its opening statement were not "fresh in the minds of the jurors" after

the presentation of evidence and closing statements).  And those concerns could

only be exacerbated here by the fact that the jury instructions—which customarily

serve to mitigate the prejudice of impermissible arguments by counsel—were not

given around the time of the prosecution's erroneous statements but, instead, two

days prior.

---

[7](...continued)
on 'recency effect,' which involves a focus on the most recent information
presented.  'Recency effects arise when a fact-finder is presented with
voluminous, challenging evidence, and they must make an immediate decision
following trial.'  This research suggests that comments in closing arguments are
likely to have outsized significance compared to comments in the middle of the
trial." (quoting Mark Spottswood, *Ordering Proof: Beyond Adversarial and
Inquisitorial Trial Structures*, 83 TENN. L. REV. 291, 293 (2015))); Ryan Patrick
Alford, *Catalyzing More Adequate Federal Habeas Review of Summation
Misconduct: Persuasion Theory and the Sixth Amendment Right to an Unbiased
Jury*, 59 OKLA. L. REV. 479, 513–14 (2006) ("Empirical studies have also
demonstrated that the recency effect is at play during trials; jurors are more likely
to remember and be influenced by trial events that occur shortly before they begin
deliberating. . . .  Indeed, because of the recency effect, the closing argument has
often been labeled the 'make or break' moment of the trial . . . ."); Hon. Amy J.
St. Eve & Gretchen Scavo, *What Juries Really Think: Practical Guidance for
Trial Lawyers*, 103 CORNELL L. REV. ONLINE 149, 168 (2018) (finding based on
survey of more than 500 jurors that "[c]losing arguments matter to juries
significantly more than opening statements," likely due to recency effects).  *See
generally* Christoph Engel et al., *Coherence-Based Reasoning and Order Effects
in Legal Judgments*, 26 PSYCHOL. PUB. POL'Y & L. 333 (2020) (summarizing
previous empirical research regarding recency effects, and conducting two studies
on legal decision-making that "consistently observed recency effects").

To be sure, the district court ensured that each juror had a written set of the instructions at the outset of the case and arranged for the original set of the written instructions to be delivered to the jury at the start of its deliberations. Indeed, the court went further, urging the jurors to review the instructions early in their deliberations and pointing out that their work as jurors would be "more productive" if they were familiar with "the legal principles upon which [their] verdict must be based." R., Vol. I, at 171 (Instr. 34); *accord id.*, Vol. III, at 621.

However, these circumstances do not alter our belief that the district court's unconventional timing here in delivering its *oral* instructions may have undermined the capacity for the instructions to mitigate the strong potential for prejudice—and actual prejudicial effects—caused by the prosecution's presumption-of-innocence advisement. A court's *oral* instructions play a unique role in ensuring that jurors gain an accurate and comprehensive understanding of a case's governing legal principles—a role that *written* instructions arguably cannot replicate. *See, e.g.*, *United States v. Becerra*, 939 F.3d 995, 1001 (9th Cir. 2019) ("[M]any jurors may not adequately comprehend written instructions. It is no secret that jury instructions are often written in language more suitable for lawyers than laypersons. . . . When the instructions are read orally, tonal inflection can make the content of the instructions more accessible, as well as discourage the 'tuning out' common when reading dense material. Oral

43

instruction in the formal courtroom setting thus assures that jurors are exposed to the substance of the essential instructions by at least one sensual route."); *see also* William W. Schwarzer, *Communicating with Juries: Problems and Remedies*, 69 CALIF. L. REV. 731, 756 (1981) ("Oral instructions can be more easily followed and understood by jurors because they are less formalized."); Robert Winslow, *The Instruction Ritual*, 13 HASTINGS L. J. 456, 470 (1962) ("If we speak directly to the jury in a personalized manner during the so-called general instructions, we will be less likely to lose their attention.").  Indeed, there is reason to believe that this unique role of oral instructions would be most fully at play when the subject matter involves complex concepts, like the government's beyond-a-reasonable doubt burden and the defendant's presumption of innocence.  *Cf.* Laurence J. Severance et al., *Toward Criminal Jury Instructions that Jurors Can Understand*, 75 J. CRIM. L. & CRIMINOLOGY 198, 203–04 (1984) (concluding based on empirical research that jurors had particular "difficulty understanding instructions on 'reasonable doubt' and the closely linked concept of 'presumption of innocence'").  Accordingly, at least under the particular circumstances here, we conclude that the court's unconventional timing in orally delivering most of its instructions—before the presentation of evidence and not close in time to the prosecution's erroneous presumption-of-innocence advisement—may have undermined the capacity of the (already unhelpful) generalized instructions to

mitigate the strong potential for prejudice—and actual prejudicial effects—of the government's advisement.

**c**

In addition to the generalized substance of the court's instructions and the unconventional timing of their oral delivery, a factor that allowed for the strong potential for prejudice—and actual prejudicial effects—of the government's presumption-of-innocence advisement was the lack of strength of the government's case.

Contrary to the government's assertion, the evidence against Mr. Starks on his possession-with-intent-to-distribute offenses of conviction was far from "overwhelming." *Cf.* Aplee.'s Resp. Br. at 21. As the government itself recognizes, "the main issue" was Mr. Starks's "knowledge of the drugs in the Toyota"—that is, the vehicle that Ms. Avery was driving. *Id.* The government had to prove beyond a reasonable doubt that Mr. Starks—who was occupying and driving the other car (the Chevy)—possessed those drugs "[o]n or about September 17, 2018," the day of his arrest. R., Vol. I, at 109–11 (Second Superseding Indictment, filed Mar. 26, 2019). More specifically, the government had to prove that on that date Mr. Starks at least constructively possessed the narcotics in the Toyota.

In this regard, the court gave the jury an instruction about possession and constructive possession, which is unchallenged here.  It reads in part:

> The law recognizes two kinds of possession: actual possession and constructive possession.  A person who knowingly has direct physical control over a thing, at a given time, is then in actual possession of it.
>
> A person who, although not in actual possession, knowingly has both the power and the intention, at a given time, to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it.

*Id.* at 150 (Instr. 15).  There was a dearth of trial evidence that Mr. Starks possessed the narcotics in the Toyota—either actually or constructively—on September 17.  Indeed, the government itself concedes that there was no direct evidence—be it "forensic evidence such as DNA or fingerprints" or anything else—that connected Mr. Starks to the drugs in the Toyota.  Aplee.'s Resp. Br. at 57.  Moreover, even though Ms. Avery's testimony inculpated Mr. Starks in other respects, as the government further acknowledges, she "did not tie [Mr. Starks] directly to the drugs in the Toyota."  *Id.* at 56–57.  Indeed, Ms. Avery could not shed any light whatsoever on whether Mr. Starks possessed the narcotics in the vehicle that she was driving because, according to her testimony, she was surprised herself upon arrest to learn that there were narcotics in the vehicle.  And Mr. Starks made no incriminating statements connecting him to the narcotics in the Toyota.  Nor, as he points out, was there any "surveillance evidence of Mr.

46

Starks dealing drugs at any point." Aplt.'s Opening Br. at 43. Our observation in *Chavez* is thus apt here as well: "in evaluating the strength of the government's case, the evidence that it did *not* produce is telling." *Chavez*, 976 F.3d at 1210.

Thus, the government's case turned on circumstantial evidence—which, contrary to the government's description, was hardly "powerful." *Cf.* Aplee.'s Resp. Br. at 57. It summarized this evidence in the following way: "[Mr. Starks] made false exculpatory statements denying that he and [Mr.] Scott were traveling together with [Ms.] Avery and [Ms.] Watt; that [Ms.] Avery and [Ms.] Watt made a similar false exculpatory statement; and that [Mr. Starks] had a prior similar drug conviction." *Id.* (citations omitted). This is hardly a smoking gun.

"[F]alse exculpatory statements . . . 'are admissible to prove circumstantially consciousness of guilt or unlawful intent.'" *United States v. Davis*, 437 F.3d 989, 996 (10th Cir. 2006) (quoting *United States v. Zang*, 703 F.2d 1186, 1191 (10th Cir. 1982)), *cert. denied*, 547 U.S. 1122 (2006). And the government is correct that certain evidence—particularly, "the turnpike records and the phones found"—would have permitted the jury to reasonably infer that Mr. Starks's statement denying knowledge of the occupants of the Toyota was false. Aplee.'s Resp. Br. at 22. However, the government's own recounting of the evidence reveals that Ms. Avery, too, made a false exculpatory statement at the time of her arrest; yet, the government did not require Ms. Avery to plead

47

guilty to possessing with the intent to distribute the narcotics in the Toyota, and she denies knowing that the drugs were present in the vehicle. So, Mr. Starks's false exculpatory statement is hardly dispositive of his knowledge and possession of these narcotics either. As for Mr. Starks's prior narcotics conviction, the court expressly instructed the jury that "the fact that [Mr. Starks] may have previously committed an act similar to the one charged in this case does not mean that [Mr. Starks] necessarily committed the act charged in this case." R., Vol. I, at 158. And we should at least presume that the jury followed this instruction. *See, e.g.*, *Weeks*, 528 U.S. at 234.

Moreover, the jury's inability to reach a verdict concerning Mr. Starks's conspiracy charge suggests that this was a close case for the jury—or, at the very least, that the evidence regarding his counts of conviction was not overwhelming—because that evidence was not "substantially different" from the evidence the government used to prove up the conspiracy charge. *Compare United States v. Reese*, 745 F.3d 1075, 1090–91 (10th Cir. 2014) (concluding that counts of conviction did not present a "close case" because the evidence supporting these counts was "substantially different from the evidence on the counts of acquittal"), *cert. denied*, 574 U.S. 894 (2014), *with Sanchez v. Mondragon*, 858 F.2d 1462, 1464, 1468 (10th Cir. 1988) (noting, where "[t]he court submitted four counts to the jury[] [for] battery, possession of a burglary

48

tool, aggravated burglary, and larceny," that the defendant "was acquitted of both aggravated burglary and larceny, [thus] indicating that the jury had some doubts about his involvement in the crime"), *overruled on other grounds by United States v. Allen*, 895 F.2d 1577 (10th Cir. 1990).

To be sure, Ms. Avery's testimony painted a picture for the jury of Mr. Starks as a seasoned drug trafficker and supplier of narcotics to Mr. Scott—including the type of drugs involved in Mr. Starks's convictions, fentanyl and heroin. And she provided dramatic, detailed testimony of Mr. Starks's supposed prior dealings with Mexican drug traffickers in seeking to secure narcotics for Mr. Scott—testimony that could have suggested to the jury a nefarious explanation for why two men, with names and birthdays identical to those of Mr. Scott and Mr. Starks, crossed the U.S.-Mexico border on foot at 9:00 p.m. EST on September 7, 2018—ten days before the Kansas Troopers arrested them—and then eighteen minutes later returned to the United States on foot via that same entry-exit point, within one minute of each other.

Yet Ms. Avery's credibility "was open to question," *Chavez*, 976 F.3d at 1212—and that is saying the very least: she was testifying under a plea agreement in the hopes of securing leniency and was an admitted drug addict. And the court's jury instructions properly warned the jury of the need to consider Ms. Avery's testimony with greater caution than an ordinary witness. *See, e.g.*, R.,

49

Vol. I, at 159 (Instr. 24) (instructing, as to a government witness testifying under a promise of favorable treatment, that the jury "should examine [the witness's] testimony with more caution and greater care than the testimony of an ordinary witness"); *id.* at 163 (Instr. 27) ("The testimony of a drug abuser must be examined and weighed by the jury with greater caution than the testimony of a witness who does not abuse drugs.").  Accordingly, Ms. Avery's testimony was hardly the stuff of an overwhelming case.

Thus, along with the generalized substance of the court's instructions and the unconventional timing of their oral delivery, a factor that allowed for the strong potential for prejudice—and actual prejudicial effects—of the government's presumption-of-innocence advisement was the lack of strength of the government's case.

\* \* \*

In sum, we determine that the court's error in allowing the government's presumption-of-innocence advisement to stand uncorrected had a strong potential for prejudice and did in fact have some prejudicial effects.  As we discuss below, we need not determine whether those prejudicial effects were of the magnitude, standing alone, to affect Mr. Starks's substantial rights, within the meaning of the plain-error test's third prong.  That is because when those prejudicial effects are cumulated with the prejudicial effects of two other errors, it is patent that Mr.

50

Starks's substantial rights were affected and his convictions are fatally infirm.

## C

We conclude, under the particular circumstances of this case, that the prejudicial effects stemming from the government's presumption-of-innocence advisement—when cumulated with the prejudicial effects of a preserved error relating to the troopers' expert testimony and an unpreserved error pertaining to the prosecution's vouching for Ms. Avery's credibility—*did* affect Mr. Starks's substantial rights, and his convictions cannot stand. In light of this cumulative-error conclusion, as with the presumption-of-innocence advisement, we have no need to make definitive determinations as to whether the prejudicial effects of each of the two additional errors, standing alone, would be sufficient to satisfy the third prong of the plain-error test.

We first outline the doctrine of cumulative error and then explain why the prejudicial effects of the court's errors with respect to the admission of the troopers' expert testimony and the prosecution's impermissible vouching regarding Ms. Avery's credibility—when cumulated with the prejudicial effects arising from the presumption-of-innocence advisement—affected Mr. Starks's substantial rights under the plain-error test's third prong. And, lastly, we discuss why we exercise our discretion to reverse Mr. Starks's convictions under that test's fourth prong.

**1**

When we engage in a cumulative-error analysis, we typically "aggregate[ ] all the errors that individually have been found to be harmless, and therefore not reversible, and . . . analyze[ ] whether their cumulative effect on the outcome of the trial is such that *collectively* they can no longer be determined to be harmless." *Lopez-Medina*, 596 F.3d at 740–41 (emphasis added) (quoting *Hooper v. Mullin*, 314 F.3d 1162, 1178 (10th Cir. 2002)). But "there are inherent problems in cumulating unpreserved error[s] (reviewed for plain error) with preserved error[s] (reviewed for harmless error)." *United States v. Caraway*, 534 F.3d 1290, 1302 (10th Cir. 2008). Therefore, our case law instructs that, when there are both preserved and unpreserved errors, the cumulative-error analysis proceeds as follows:

> First, the preserved errors should be considered as a group under harmless-error review. If, cumulatively, they are not harmless, reversal is required. If, however, they are cumulatively harmless, the court should consider whether those preserved errors, when considered in conjunction with the unpreserved errors, are sufficient to overcome the hurdles necessary to establish plain error. In other words, the prejudice from the unpreserved error is examined in light of any preserved error that may have occurred. For example, the defendant may not be able to establish prejudice from the cumulation of all the unpreserved errors, but factoring in the preserved errors may be enough for the defendant to satisfy his burden of showing prejudice. If so, the fourth prong of plain-error review must then be examined.

*Id.* Under this framework, we assume without deciding that each of the three

52

errors at issue here—though producing *some* prejudicial effects—would ultimately be determined, standing alone, to be harmless. Under this assumption, it is only when their prejudicial effects are cumulated that they affect substantial rights.

**2**

"We review a district court's determination regarding the admissibility of evidence under an abuse of discretion standard." *United States v. Contreras*, 536 F.3d 1167, 1170 (10th Cir. 2008). This includes the court's decision regarding the admission of expert testimony under Federal Rule of Evidence 702. *See United States v. Roach*, 582 F.3d 1192, 1206 (10th Cir. 2009) (reviewing a court's decision on "whether to admit or exclude an expert's testimony for abuse of discretion" (quoting *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003))); *see also James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1214 (10th Cir. 2011) (holding that the district court abused its discretion in admitting as a lay opinion testimony, what was actually expert opinion testimony "based on technical or specialized knowledge").

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion."[8] FED. R. EVID. 702. Testimony becomes "expert

---

[8]    Conversely, Federal Rule of Evidence 701 provides that the

(continued...)

testimony" when it addresses topics that are "beyond the realm of common experience and . . . require the special skill and knowledge of an expert witness." *James River Ins.*, 658 F.3d at 1214 (quoting *Randolph v. Collectramatic, Inc.*, 590 F.2d 844, 846 (10th Cir. 1979)).

Knowledge drawn from experience in a specialized job—including, as here, a law enforcement officer's knowledge of drug trafficking patterns and practices—falls "squarely" within the scope of expert testimony under Rule 702. *United States v. Cristerna-Gonzalez*, 962 F.3d 1253, 1259 (10th Cir. 2020) (addressing agent's testimony on drug slang, culture, and trafficking protocol as expert testimony under Rule 702); *accord United States v. Cushing*, 10 F.4th 1055, 1079–80 (10th Cir. 2021). "Although the line is not always clear, . . . 'opinion testimony premised on the officer's professional experience *as a whole* is expert testimony' under Rule 702." *United States v. Draine*, 26 F.4th 1178, 1187 (10th Cir. 2022) (emphasis added) (quoting *Cushing*, 10 F.4th at 1080); *see also United States v. Kamahele*, 748 F.3d 984, 998 (10th Cir. 2014) ("[W]e have long recognized that police officers can testify as experts based on their

---

[8](...continued)
testimony of a witness who is not testifying as an expert is limited to opinions that are "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EVID. 701(c); *see also United States v. Draine*, 26 F.4th 1178, 1187 (10th Cir. 2022) (noting that "'a law-enforcement officer's testimony based on knowledge derived from the investigation of the case at hand is typically regarded as lay testimony' under Rule 701" (quoting *United States v. Cushing*, 10 F.4th 1055, 1080 (10th Cir. 2021))).

experience '[b]ecause the average juror is often innocent of the ways of the criminal underworld.'" (second alteration in original) (quoting *United States v. Garcia*, 635 F.3d 472, 477 (10th Cir. 2011))).

The government does not dispute that Mr. Starks preserved at trial his challenge to the admission of the expert testimony of Troopers Goheen and Birney,[9] and that the district court abused its discretion in admitting this testimony. However, the government argues that the court's error in admitting this testimony was harmless and should not lead to reversal. Having evaluated the balance of the evidence, we are willing to at least assume that this is true, but only insofar as this expert-testimony error is considered in isolation. But that does not mean that the error was devoid of *some* prejudicial effects. And we conclude that the cumulative effects of this error with the two other errors addressed here affected Mr. Starks's substantial rights.

Recall that the major deficiency in the government's case pertained to the lack of evidence connecting Mr. Starks to the narcotics in Ms. Avery's vehicle (i.e., the Toyota). As the government itself tells us, "the main issue in the case . . . was whether [Mr. Starks] had knowledge of the drugs in the Toyota." Aplee.'s

---

[9] Mr. Starks's counsel timely objected to five statements from Troopers Goheen and Birney on the grounds that they constituted impermissible expert testimony and were introduced without appropriate notice under federal discovery rules. *See* FED. R. CRIM. P. 16(a)(1)(G). Those objections were overruled, but preserved for appeal. *See Rogers v. Roth*, 477 F.2d 1154, 1160 (10th Cir. 1973).

55

Resp. Br. at 21.  Yet there was a dearth of evidence indicating that Mr. Starks knew there were narcotics in that vehicle and contemporaneously intended to exercise dominion or control over them—that is, to constructively possess the narcotics (as well as, of course, a lack of evidence of actual possession).  Indeed, though Ms. Avery's testimony incriminated Mr. Starks in other respects, she could not shed any light on whether Mr. Starks possessed (actually or constructively) the narcotics in the vehicle that she was driving because, according to her testimony, she was surprised herself upon arrest to learn that there were narcotics in the vehicle.

Critically, the improperly admitted expert testimony of the troopers significantly helped to fortify the proof regarding the "main issue," *id.*, in the government's case.  In particular, this testimony purported to educate the jury regarding the patterns and practices of drug traffickers relating to the vehicular movement of narcotics.  The government sought to demonstrate through this expert testimony that Mr. Starks drove his vehicle in a manner consistent with the practices of drug traffickers.  In other words, the troopers offered their opinions, as experts, that Mr. Starks drove his vehicle in a manner consistent with the conduct of one who knew that he was facilitating the movement of narcotics.  For example, recall that Trooper Goheen testified that Mr. Starks was traveling on an interstate drug-trafficking route, *see* R., Vol. III, at 277, and that, based on his

training and experience, drug traffickers use "escort vehicles or decoys" to divert law enforcement from load vehicles, *id.* at 357–58. And Trooper Birney testified that, based on his training and experience, "just everything [was] adding up" that the two vehicles in this case and their occupants were operating together. *Id.* at 411.

The troopers' improper expert testimony thus lent credence to the government's contention that Mr. Starks constructively possessed with intent to distribute the narcotics in the vehicle that Ms. Avery was driving. Indeed, from this testimony, a reasonable jury arguably could infer that not only did Mr. Starks know the identities of the individuals occupying the vehicle driven by Ms. Avery, but also that he knew that the vehicle contained and was transporting narcotics for distribution.

Furthermore, through its statements to the jury at the beginning and the end of the trial, the prosecution stressed that the officers' expert testimony concerning the patterns and practices of drug traffickers mirrored the actual driving patterns and practices of Mr. Starks. For instance, alluding to the troopers' expected testimony, the prosecution pointed out that "you'll have an escort vehicle. That escort vehicle's job is to make sure the dope gets home, it gets to the ultimate source." *Id.* at 77. And then shortly thereafter, in discussing Trooper Goheen's actual observations of the vehicles being driven by Mr. Starks and Ms. Avery, the

prosecution said, "[t]urns out [Mr. Starks] was driving that escort vehicle." *Id.* at

78.

Moreover, during closing arguments, the government emphasized the

importance of this testimony, saying:

> Remember the testimony of Trooper Goheen. Trooper Goheen told you that based on his training and experience, what you see in interdiction is a load car and then an escort car. In this case, who's driving that escort car? The defendant [i.e., Mr. Starks].
>
> What does the defendant do? The defendant, when he sees the trooper pulling up along side, about to pull over the dope car, he whips over and tailgates a trooper.
>
> I challenge any of you to pull over and tailgate a trooper like that without knowing exactly what's going to happen.

*Id.* at 630. The government thus directly and strongly leaned into the troopers'

status as experts in arguing that Mr. Starks's otherwise unremarkable driving on

the interstate bore the hallmarks of drug trafficking. *See* Aplt.'s Reply Br. at 6

("The prosecutor then exploited that expert testimony at the end of the trial during

closing argument to establish the disputed issues that the government

acknowledges no direct evidence proved: Mr. Starks's possession, control, and

intent with respect to the drugs.").

The impact of the troopers' improperly admitted expert testimony was thus

significant. It fortified the proof regarding the "main issue," Aplee.'s Resp. Br. at

21, in the government's case against Mr. Starks—that is, whether he

constructively possessed the narcotics in the Toyota being driven by Ms. Avery.

Consequently, we can say that this error at least had *some* prejudicial effects

during Mr. Starks's trial.[10]  We already have homed in on and discussed at some

length the prejudicial effects of one of the unpreserved errors—perhaps the most

problematic one—related to the prosecution's presumption-of-innocence

advisement.  Now we turn to examine the other unpreserved error related to the

government's vouching for Ms. Avery's credibility.[11]

**3**

"It is a due process error for a prosecutor to indicate 'a personal belief in

---

[10]    It is not a sufficient rebuttal to this assertion to say—as the
government does—that the troopers would have been qualified as experts in any
event.  *See* Aplee.'s Resp. Br. at 25 ("Because the troopers could have been
qualified under Rule 702 to give the testimony, the failure to so qualify them was
harmless.").  This may be a persuasive argument under some circumstances.  *Cf.
Draine*, 26 F.4th at 1189 (in concluding the defendant had not established that his
substantial rights were affected by the admission of expert law enforcement
testimony, observing that "he has not shown that, had he objected or had the
district court addressed sua sponte [the officers'] qualifications, they likely would
have been found unqualified under Rule 702").  But, as Mr. Starks points out, he
"did not just object that the troopers were not properly qualified.  He objected
that he did not receive proper notice of the substance of their testimony . . . ."
Aplt.'s Reply Br. at 8.  Moreover, we assume in this discussion that the error,
*standing alone*, was ultimately harmless, as the government argues; that is not
logically inconsistent, however, with our conclusion that the error at least had
*some* prejudicial effects.

[11]    Ordinarily, under *Caraway*'s framework, we would cumulate other
preserved errors first.  *See Caraway*, 534 F.3d at 1302.  But there are no such
errors amongst the errors that we have targeted for analysis.  So, we proceed to
cumulate the preserved error regarding the troopers' expert testimony with the
two unpreserved errors that we have elected to address.

the witness' credibility . . . .'"  *United States v. Jones*, 468 F.3d 704, 707 (10th

Cir. 2006) (quoting *United States v. Bowie*, 892 F.2d 1494, 1498 (10th Cir.

1990)).   Discouraging prosecutors from engaging in vouching is critical because

"the prosecutor's opinion carries with it the imprimatur of the Government and

may induce the jury to trust the Government's judgment rather than its own view

of the evidence."  *Young*, 470 U.S. at 18–19.  We distinguish between a

prosecutor's "fair[ ] comment on the evidence" to a jury, *United States v. Orr*,

692 F.3d 1079, 1097 (10th Cir. 2012), which is permissible, and "vouching by an

attorney as to the veracity of a witness[, which] is improper conduct and an error

which this Court will carefully review," *United States v. Swafford*, 766 F.2d 426,

428 (10th Cir. 1985).  "An argument is only improper vouching '"if the jury could

reasonably believe that the prosecutor is indicating a personal belief in the

witness' credibility, either through explicit personal assurance of the witness'

veracity or by implicitly indicating that information not presented to the jury

supports the witness' testimony."'"  *United States v. Franklin-El*, 555 F.3d 1115,

1125 (10th Cir. 2009) (quoting *United States v. Magallanez*, 408 F.3d 672, 680

(10th Cir. 2005)); *accord Anaya*, 727 F.3d at 1053–54.  In other words,

"[v]ouching requires 'either . . . explicit personal assurances of the witness's

veracity or . . . implicit[] indicat[ions] that information not presented to the jury

supports the witness's testimony.'"  *Anaya*, 727 F.3d at 1053 (second and third

alterations and omissions in original) (quoting *Orr*, 692 F.3d at 1097); s*ee also*

*Christy*, 916 F.3d at 834 (concluding that statement in rebuttal closing argument

that the witness was "probably the most sincere witness the prosecutor had ever

seen" constituted plainly improper vouching).

Invoking the plain-error rubric, Mr. Starks argues that the prosecution

improperly vouched for the credibility of Ms. Avery's testimony.  Specifically,

the prosecution stated that Ms. Avery was bound to a plea agreement requiring

her "only to do one thing: [t]ell the truth."  R., Vol. III, at 631.  The prosecution

added, "[n]obody has ever told her to do anything other than tell the truth.  And

she sat there and she told you the absolute truth . . . ."  *Id.*  Mr. Starks's counsel

did object to this statement as improper vouching.  The district court sustained the

objection and instructed the jury to disregard the statement.  Nevertheless, Mr.

Starks concedes here that his appellate challenge to the prosecution's vouching

was not preserved and subject to plain-error review because he "did not request

further curative action when his objections were sustained."[12]  Aplt.'s Opening

Br. at 33.  He maintains, however, that this error was clear or obvious, violated

his substantial rights, and should lead us to rule in his favor under the plain-error

standard.  Notably, the government does not dispute that the prosecution

committed clear or obvious error; however, it contends that the error did not

---

[12]     We accept Mr. Starks's concession on the preservation question and do not independently opine on the matter.

affect Mr. Starks's substantial rights—i.e., the error did not satisfy the plain-error test's third prong.

We assume without deciding, for purposes of our cumulative-error analysis, that the government is correct—that Mr. Starks has not satisfied the third prong, when this error is considered alone.  But that does not mean that this error was devoid of all prejudicial effects.  The credibility of Ms. Avery's testimony was critical to the prosecution's case.  In particular, Ms. Avery's testimony painted a picture for the jury of Mr. Starks as a seasoned drug trafficker and supplier of narcotics to Mr. Scott—including the drugs involved in Mr. Starks's convictions, fentanyl and heroin.  And she provided dramatic, detailed testimony of Mr. Starks's supposed prior dealings with Mexican drug traffickers in seeking to secure narcotics for Mr. Scott—testimony that could have suggested to the jury an illicit reason why two men, with names and birthdays identical to those of Mr. Scott and Mr. Starks, crossed the U.S.-Mexico border on foot at 9:00 p.m. EST on September 7, 2018—ten days before the Kansas Troopers arrested them—and then eighteen minutes later returned to the United States on foot via that same entry-exit point, within one minute of each other.

However, as we have noted, Ms. Avery's credibility clearly "was open to question," *Chavez*, 976 F.3d at 1212: she was testifying under a plea agreement in the hopes of securing leniency and was an admitted drug addict.  And the court

62

properly instructed the jury about the need to consider Ms. Avery's testimony with comparatively greater caution.[13]  Accordingly, almost any elevation of Ms. Avery's credibility standing in the eyes of the jury would have been beneficial in some appreciable measure to the government's case.  And Mr. Starks makes at least a colorable argument that the court's "curative instruction was not strong enough to mitigate the harm."  Aplt.'s Reply Br. at 13 (citing *United States v. Alancantara-Castillo*, 788 F.3d 1186, 1197–98 (9th Cir. 2015)).  Accordingly, even though we assume that that this vouching error was not sufficient, standing alone, to affect Mr. Starks's substantial rights, we cannot conclude that the government's vouching for the credibility of Ms. Avery's testimony did not benefit the government's case and appreciably prejudice Mr. Starks.

**4**

When the prejudicial effects of the preserved error relating to the troopers' expert testimony and the unpreserved error concerning the prosecution's vouching for the credibility of Ms. Avery's testimony are combined with the prejudicial effects stemming from the court's failure to correct the government's presumption-of-innocence advisement, we conclude that Mr. Starks's substantial

---

[13]    *See, e.g.*, R., Vol. I, at 159 (Instr. 24) (instructing, as to a government witness testifying under a promise of favorable treatment, that the jury "should examine [the witness's] testimony with more caution and greater care than the testimony of an ordinary witness"); *id.* at 163 (Instr. 27) ("The testimony of a drug abuser must be examined and weighed by the jury with greater caution than the testimony of a witness who does not abuse drugs.").

rights were affected.  In this regard, recall that the latter error involving the presumption of innocence "went directly to a fundamental precept guiding the factfinder's evaluation of guilt or innocence."  *Mahorney*, 917 F.2d at 474.  The government effectively told the jury that when it was deliberating regarding the elements of Mr. Starks's charged offenses—including the critical element of (constructive) possession—that Mr. Starks no longer was clothed in the presumption of innocence, a presumption that properly "is extinguished only upon the *jury's* determination that guilt has been *established beyond a reasonable doubt*."  *Id.* at 471 n.2 (second emphasis added).  Accordingly, applying the cumulative-error doctrine under the circumstances here, we conclude that the plain-error test's third prong is satisfied—that is, Mr. Starks has established that his substantial rights were violated.

**5**

Lastly, applying the cumulative-error rubric, we exercise our discretion under the plain-error test's fourth prong to notice this cumulative prejudice and reverse Mr. Starks's convictions.  At issue here, in substantial part, are errors of constitutional magnitude.  And where such errors are present under plain-error review, "reversal usually directly cures the constitutional infirmity and, as a result, the failure to notice and correct the constitutional error would impugn the fairness, integrity, or public reputation of judicial proceedings."  *United States v.*

64

*Mozee*, 405 F.3d 1082, 1091 (10th Cir. 2005); *see also Gonzalez-Huerta*, 403 F.3d at 745 (Hartz, J., concurring) ("Not to reverse to correct the error is to ignore the injury the defendant suffered from the violation of his or her constitutional rights.").

Furthermore, it is difficult to overstate the importance of the presumption of innocence to the fairness and integrity of our criminal justice system. The presumption of innocence is a "bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.'" *In re Winship*, 397 U.S. 358, 363 (1970) (quoting *Coffin v. United States*, 156 U.S. 432, 453 (1895)); *accord Taylor v. Kentucky*, 436 U.S. 478, 483 (1979). And the right to be presumed innocent is especially important in a case like this one, where the evidence was circumstantial and not overwhelming. Under these circumstances, the presumption of innocence "cautions the jury to put away from their minds all the suspicion that arises from the arrest, the indictment, and the arraignment, and to reach their conclusion solely from the legal evidence adduced." *Taylor*, 436 U.S. at 485. But Mr. Starks's jury was told that this presumption evaporated at the close of the evidence—before it began deliberating on his guilt and innocence.

In light of these important considerations, we exercise our discretion to notice the cumulative prejudicial effects of the three errors discussed above and

determine that these errors "seriously affect[ed] the fairness, integrity, or public reputation of [the] judicial proceedings." *United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1222 (10th Cir. 2008) (quoting *United States v. Lopez-Flores*, 444 F.3d 1218, 1221 (10th Cir. 2006)). Accordingly, Mr. Starks's convictions cannot stand.

## III

For the foregoing reasons, we **REVERSE** the district court's judgment and **REMAND** the case, instructing the court to **VACATE** Mr. Starks's convictions and conduct further proceedings not inconsistent with this opinion.